# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 25 CR 10472 |
| | ) | Hon. Brian E. Murphy |
| KYLE SVARA, | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT KYLE SVARA'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

**BREEN & PUGH**
53 W. Jackson Blvd., Suite 1550
Chicago, Illinois 60604
(312) 360-1001 (t)
(312) 362-9907 (f)
tpugh@breenpughlaw.com

**LAW OFFICE OF**
**JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, Illinois 60604
(312) 909-0434 (t)
(312) 883-3519 (f)
jherman@joshhermanlaw.com

**LAW OFFICES OF**
**WILLIAM H. CONNOLLY**
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 866-8610 (t)
whc@williamconnollylaw.com

## Table of Contents

INTRODUCTION ........................................................................................................ 1

PROCEDURAL HISTORY .......................................................................................... 4

OBJECTIONS AND CLARIFICATIONS TO THE PRESENTENCE
INVESTIGATION REPORT ........................................................................................ 5

   A. The Court Should Reject the Government's Proposed Two-Level
   Enhancement Under USSG § 2B1.1(b)(4)................................................................. 6

   B. Clarification: The Scope of the Offense, Precisely Stated................................. 7

   C. Clarification: The Proffer-Protected Evidence in Paragraphs 33 Through 38 Is
   Tied to Count Five and Should Not Expand the Scope of Sentencing Beyond It. . 9

SENTENCING MEMORANDUM ............................................................................. 10

   Analysis of the § 3553(a) Sentencing Factors...................................................... 11

   A. The Nature and Circumstances of the Offense Warrant a Sentence of No
   More Than 36 Months. .......................................................................................... 11

   B. Mr. Svara's History and Characteristics Justify a Sentence of No More Than
   36 Months. ............................................................................................................. 13

      1. Bullying, Depression, Isolation, and a Need for Acceptance..................... 13

      2. High School Struggles and an Early Introduction to Trading Explicit
      Images ............................................................................................................. 15

      3. College, the COVID Lockdown, and the Start of the Offense Conduct ..... 16

      4. Mr. Svara's Tremendous Family Support.................................................... 18

      5. Mr. Svara's Commitment to Therapy and His Low Risk of Recidivism.... 20

      6. Mr. Svara's Youth at the Time of the Offense ........................................... 22

   C. A Sentence of No More Than 36 Months Satisfies the Need for Just
   Punishment and Adequate Deterrence................................................................. 24

   D. A Sentence of No More Than 36 Months Avoids Unwarranted Sentencing
   Disparities. ............................................................................................................ 27

CONCLUSION .......................................................................................................... 30

CERTIFICATE OF SERVICE.................................................................................. 31

## Table of Authorities

### Cases

*United States v. Abrahams*, No. 8:13-cr-00199 (C.D. Cal.)........................................ 29

*United States v. Adams*, No. 23-cr-00204 (E.D. Pa.)................................................ 28

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) .............................................. 26

*United States v. Boyer*, No. 23-cr-00232 (M.D. Pa.) ............................................... 29

*United States v. Cabrera*, 567 F. Supp. 2d 271 (D. Mass. 2008) .............................. 26

*United States v. Coviello*, 225 F.3d 54 (1st Cir. 2000) ............................................... 7

*United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) ................................... 26

*United States v. Faber*, No. 8:21-cr-00021 (N.D.N.Y.) ........................................... 29

*United States v. Majerczyk*, No. 1:16-cr-00550 (N.D. Ill.)........................................ 28

*United States v. McMinn*, 103 F.3d 216 (1st Cir. 1997) ........................................ 6-7

*United States v. Moore & Evens*, No. 2:13-cr-00917 (C.D. Cal.)...........................28-29

*United States v. Potts*, No. 6:19-cr-06034 (W.D.N.Y.) ........................................... 29

*United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005) ............................... 26

*United States v. Reyes Ruiz*, No. 5:19-cr-00159 (N.D. Cal.)..................................... 29

*Santobello v. New York*, 404 U.S. 257 (1971) ........................................................ 10

*United States v. St. Cyr*, 977 F.2d 698 (1st Cir. 1992)................................................ 6

*United States v. Waithe*, No. 21-CR-10342-PBS (D. Mass. Mar. 6, 2024), *aff'd*, 150 F.4th 16 (1st Cir. 2025) .........................................................................................27-28

*United States v. Wilson*, No. 22-cr-00048 (W.D. Ky.)............................................... 29


### Statutes

18 U.S.C. § 371................................................................................................ 4

18 U.S.C. § 1001(a)(2), (a)(3) ........................................................................... 5

18 U.S.C. § 1028A(a)(1) ............................................................................ 4, 5, 25

18 U.S.C. § 1030(a)(4)................................................................................... 4, 5

18 U.S.C. § 1343.............................................................................................. 4

18 U.S.C. § 3553(a) .................................................................................. *passim*

## Rules

Fed. R. Civ. P. 5 .................................................................................................... 31

Fed. R. Crim. P. 11(c)(1)(B) ................................................................................... 5

Fed. R. Crim. P. 49 ................................................................................................ 31

## Sentencing Guidelines

USSG § 2B1.1.............................................................................................. *passim*

USSG § 2B1.1(b)(4) ............................................................................................ 6, 7

USSG § 2B1.1(b)(10)(C) .......................................................................................... 6

USSG § 2B1.2 .......................................................................................................... 6

USSG § 2B1.6(a) ..................................................................................................... 5

USSG § 3B1.3 .......................................................................................................... 5

USSG § 5H1.1 ..................................................................................................22-23

USSG Amendment 836 ......................................................................................... 23

USSG Appendix B (May 1, 2025) .......................................................................... 23

## Other Authorities

Amy Adele Hasinoff, *Teenage Sexting is Not Child Porn,*
N.Y. Times (Apr. 4, 2016) ..................................................................................... 16

Alexandra Sifferlin, *Teen Sexting Has Become Even More Common, Research Says,*
Time (Feb. 26, 2018) ............................................................................................. 16

*Just,* Merriam-Webster.com...................................................................................... 24

USSG Letter, Sept. 3, 2025 .................................................................................. 23

Victor C. Strasburger et al., *Teenagers, Sexting, and the Law,* 143 Pediatrics 1
(2019) .................................................................................................................. 15-16

## INTRODUCTION

*"There is no person so severely punished as those who subject themselves to the whip of their own remorse."*
— *Lucius Annaeus Seneca*

Kyle Svara understands what he did. He is overwhelmed by shame and by remorse, and he does not ask this Court to look away from either. He accepts the harm he caused: severe invasions of privacy and grave breaches of trust, inflicted on those he knew and strangers alike. He accepts, too, that the forgiveness he seeks may not come easily, or at all. For now, he understands that the victims' voices must be heard and heard first.

As charged, the Snapchat phishing scheme at the core of Counts One through Four stopped in early 2021, more than three years before agents came to Mr. Svara's door. When they did come in July 2024, he was frightened. He lied. He is not proud of that either; he has pleaded guilty to it. But that watershed moment also forced Mr. Svara to confront a depression that had shadowed him since childhood, an unwelcome but ever-present sidekick he had learned to hide so well. Overachievement was his mask. Beneath it, a profound loneliness pushed him toward the internet, first for connection, and then toward the offense conduct here. None of this excuses what he did. It explains it, and explanation matters to the factors this Court must weigh under 18 U.S.C. § 3553(a): the nature and circumstances of the offense, and the history and characteristics of Kyle Svara. And what matters most is he has already shown the capacity to change.

1

Since his arrest, Mr. Svara has reckoned with the roots of his crimes in sustained therapy and treatment, a process he understands will not end when this case does. His treating counselor reports that Mr. Svara has "demonstrated significant stabilization since entering treatment" and that, with continued care, his risk of recidivism is "significantly reduced." (Giannasi Letter, p. 3). A licensed sex offender evaluator who examined Mr. Svara and reviewed the offense conduct concluded that he presents a "low recidivism risk regarding a sexual offense." (Dr. Smith Report, p. 11).[1] *See also* PSR, ¶ 88 (noting Dr. Smith's conclusion that Mr. Svara "presented a low risk of recidivism regarding a sexual offense and stated that he had many protective factors supportive of treatment."). Nearly 40 family members, friends, coworkers, coaches, and neighbors echo these professional judgments in letters that return, again and again, to the same two themes: remorse and redemption. His wife, Emily, who has stood beside him through all of it, captures both:

> Kyle has never made excuses for his mistakes. He has taken full responsibility for his actions with genuine remorse and heartbreak for the pain he caused. I have seen him at his lowest — breaking down in tears, overwhelmed by guilt, knowing he needed help. And he sought that help. We found a counselor, and Kyle committed himself to becoming better — not just for himself, but for our family, most importantly for our son.

---

[1] Defendant has sought leave to submit these records under seal due to the sensitive medical information they discuss. Mr. Giannasi's letter will be submitted as Exhibit B and Dr. Smith's report will be submitted as Exhibit C. Both have already been provided to Probation and the government.

(Emily Svara, p. 1).[2] Her words mirror the professionals' clinical conclusions: sustained engagement in therapy meaningfully lowers Mr. Svara's risk of reoffending.

Mr. Svara knows that prison is inevitable, and he accepts it. He knows it will separate him from his wife and from a son who is not yet old enough to remember his father's absence, and he accepts that too. The government and the victims may want a sentence with no room for leniency. What Mr. Svara asks for is different: a sentence that matches the crime he committed, not the worst version of it that can be imagined.

The PSR correctly calculates Mr. Svara's advisory guideline range, correctly, at 32 to 38 months: 8 to 14 months on the grouped fraud and computer-fraud counts, plus the 24-month mandatory consecutive term for aggravated identity theft. (PSR ¶¶ 59, 105). That is the range this Court should use as its starting point. Real-world sentencing data for defendants who share Mr. Svara's offense level and criminal history category confirm that this range is not lenient: it lands squarely where similarly situated defendants across the country have been sentenced. (PSR ¶ 119). For the reasons below, a sentence of no more than 36 months, within that properly calculated range, is sufficient and no greater than necessary to satisfy every purpose that § 3553(a) requires.

---

[2] Character letters submitted by family members and friends are attached hereto as group Exhibit A and are referenced by the author and page number.

## PROCEDURAL HISTORY

On July 30, 2024, federal investigators executed search warrants at Mr. Svara's Illinois residence. (PSR ¶ 22). They seized several electronic devices and interviewed him that day. By then, investigators had already gathered evidence of Mr. Svara's online activity and his role in accessing social-media accounts without authorization to obtain young women's images. (PSR ¶¶ 22, 30–31). Investigators reached Mr. Svara only after first responding, in October 2020, to reports from female students at Northeastern University who had experienced computer intrusions and harassment at the hands of a different man, Steve Waithe, a former track coach at that university. The investigation into Waithe led the FBI to Mr. Svara.

Following the search and Mr. Svara's initial interview, counsel sought to quickly resolve the case. The parties engaged in extensive pre-charging discussions, including a proffer session with Mr. Svara in February 2025. Information Mr. Svara provided at that proffer, unrelated to the Snapchat scheme, later proved untrue, and the government identified that discrepancy. The parties' good-faith discussions nonetheless continued and produced the Information filed on December 31, 2025. (Dkt. 1).

The Information charges Mr. Svara with Aggravated Identity Theft, 18 U.S.C. § 1028A(a)(1) (Count One); Wire Fraud, 18 U.S.C. § 1343 (Count Two); Conspiracy to Commit Computer Fraud, 18 U.S.C. §§ 371, 1030(a)(4) (Count Three); Computer Fraud, 18 U.S.C. § 1030(a)(4), (c)(3)(A) (Count Four); and False Statements, 18 U.S.C. § 1001(a)(2), (a)(3) (Count Five).

On January 27, 2026, Mr. Svara entered a plea agreement under Fed. R. Crim. P. 11(c)(1)(B) and pleaded guilty to all five counts, waiving indictment. (PSR ¶ 2). At that time, the government estimated an adjusted offense level of 14, yielding an advisory range of 15 to 21 months, before application of the obstruction, acceptance-of-responsibility, and zero-point-offender adjustments addressed below. The defense reserved the right to contest several proposed enhancements. Both parties agree that Count One carries a mandatory 24-month term, to run consecutively to any sentence on the remaining counts. 18 U.S.C. § 1028A(a)(1); USSG § 2B1.6(a).

Mr. Svara has complied with every condition of his release since this case began. (PSR ¶ 3). As set forth below, the Probation Office has since correctly recalculated Mr. Svara's total offense level at 11, yielding an advisory range of 8 to 14 months on the grouped counts, 32 to 38 months in total. (PSR ¶¶ 59, 105).

### OBJECTIONS AND CLARIFICATIONS TO THE PRESENTENCE INVESTIGATION REPORT

The Presentence Investigation Report correctly calculates Mr. Svara's total offense level at 11 and his criminal history category at I, yielding an advisory range of 8 to 14 months on the grouped Counts Two through Five, consecutive to the mandatory 24-month term on Count One, for a total advisory range of 32 to 38 months. (PSR ¶¶ 59, 105; Sentencing Options at 31). Mr. Svara's own objection to the Report, that the two-level special-skill enhancement under USSG § 3B1.3 double-counted conduct already captured by the sophisticated-means enhancement at USSG § 2B1.1(b)(10)(C), was sustained by the Probation Office and no longer requires this Court's attention. (PSR Add. at 40–42). One guideline dispute remains: the

5

government asks this Court to add two levels under USSG § 2B1.1(b)(4) on the theory that Mr. Svara was "in the business of receiving and selling stolen property." The Probation Office rejected that request, and Mr. Svara respectfully asks this Court to do the same. He also offers two clarifications relevant to this Court's consideration of the § 3553(a) factors below.

## A.    The Court Should Reject the Government's Proposed Two-Level Enhancement Under USSG § 2B1.1(b)(4).

Section 2B1.1(b)(4) adds two levels where "the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property." The provision once resided in USSG § 2B1.2, and the First Circuit held then, and holds now, that it targets the professional fence, not the professional thief. *United States v. McMinn*, 103 F.3d 216, 219 (1st Cir. 1997) (citing *United States v. St. Cyr*, 977 F.2d 698, 702 (1st Cir. 1992)). "A defendant engaged in selling only the property he is responsible for stealing has not 'received' it in the sense contemplated by the Sentencing Commission." *Id.* at 220. A thief who distributes only what he personally stole "would not qualify for the [enhancement] if the only goods he distributed were those which he had stolen." *Id.* at 222.

Mr. Svara is a thief. He is not a fence. He personally executed the phishing scheme that gave him access to his victims' Snapchat accounts, and he personally downloaded what he found there. (PSR ¶¶ 8–17). He did not purchase stolen images from other hackers and resell them into a broader market. The only payment he ever received for any of this conduct, three payments totaling $50 from Steve Waithe, compensated content Mr. Svara himself had stolen at Waithe's request; it was not a

commission on someone else's theft. (PSR ¶ 19). *McMinn* forecloses the enhancement on those facts alone.

Even apart from *McMinn*, the totality of the circumstances does not support the enhancement. *United States v. Coviello* directs courts to weigh, among other factors, the regularity and sophistication of the defendant's operation, the value of the property involved, and any history of similar conduct. 225 F.3d 54, 64 (1st Cir. 2000); USSG § 2B1.1(b)(4), cmt. n.5. Three payments over less than a year, totaling $50, is not a business by any ordinary measure. Nothing in this record shows that Mr. Svara advertised a resale operation, set prices, or built any enterprise beyond the ad hoc, peer-to-peer image trading common to the forums he frequented. The Probation Office weighed these same factors and reached the same conclusion: "the defendant is the thief, not the fence." (PSR Add. at 39). This Court should adopt that reasoning.

The total offense level therefore remains 11, not the government's proposed 14, and the properly calculated advisory range remains 32 to 38 months.

## B.    Clarification: The Scope of the Offense, Precisely Stated.

The government will understandably emphasize the scale of Mr. Svara's scheme, and Mr. Svara does not dispute the figures the Probation Office has now confirmed. He sent phishing messages to at least 1,571 unique phone numbers, and investigators have identified 738 individuals among them as targeted victims. (PSR ¶¶ 12, 39; PSR Add. at 44).[3] Of those 738, at least 557 responded with an access code,

---

[3] The defense acknowledges that the government has more recently noted that this number is now more than 738.

and the government's own records reflect that Mr. Svara unlawfully accessed at least 517 accounts. (PSR Add. at 44–45). These are serious numbers. Mr. Svara does not ask this Court to ignore them.

He does ask the Court to keep separate three measures that easily blur together: the number of people texted, the number who responded, and the number whose accounts were indeed compromised. The PSR, as now amended, appropriately distinguishes among them. (PSR Add. at 43–45, amending PSR ¶¶ 12 n.4, 19, 39, 49). One further figure belongs in the same picture: when investigators seized Mr. Svara's phone in July 2024 it held content connected to eleven identified victims of that scheme, together with roughly four hundred additional Snapchat-related images the government has not matched to a name. (PSR ¶ 29). That number reflects what Mr. Svara personally retained and controlled when law enforcement intervened, and it deserves a place alongside the 700 plus people he once targeted.

The Court should also note, as the Probation Office has now clarified, that Mr. Svara had no personal connection to Northeastern University or to Colby College. (PSR Add. at 45). The victims connected to Northeastern came to Mr. Svara through his co-conspirator, Steve Waithe, and those of Colby College likewise did not come through any relationship of Mr. Svara's own. (PSR ¶¶ 18–20). Mr. Svara's independently selected targets were drawn instead from the Plainfield, Illinois community where he grew up: neighbors, classmates, and friends of his family. (PSR ¶ 21). That fact does not excuse the conduct. It does mean that the breach-of-trust narrative that fairly attaches to the Plainfield-connected and Waithe-connected

8

victims cannot be stretched to cover the entire pool of 700 plus people Mr. Svara texted, the great majority of whom he had never met.

**C.    Clarification: The Proffer-Protected Evidence in Paragraphs 33 Through 38 Is Tied to Count Five and Should Not Expand the Scope of Sentencing Beyond It.**

Paragraphs 33 through 38 of the Report describe material investigators found after Mr. Svara consented, through counsel and pursuant to a proffer letter, to the government's assumption of certain online accounts. (PSR ¶¶ 32–33 & n.11). What investigators found there is deeply disturbing, and Mr. Svara does not minimize it or ask the Court to overlook it. That material formed the basis for Count Five, and Mr. Svara has pleaded guilty to lying to investigators about it. He accepts the two-level obstruction enhancement that conduct carries. (PSR ¶ 54).

The government's own submission defines the limits of that material's use. The Report explains that the government has "taken the conservative stance that because Svara provided oral consent for the government to seize his online accounts during the initial proffer meeting, the material contained in these accounts is proffer-protected," and that the government treats this evidence "as admissible only for the purpose of the government's prosecution of Svara for the statements he made related to child pornography, which this evidence proves false." (PSR ¶ 33 n.11). Proffer agreements, like plea agreements, are construed under ordinary contract principles, and the government's own commitments within them bind the government at sentencing no less than at trial. *Santobello v. New York*, 404 U.S. 257, 262 (1971) (where a guilty plea "rests in any significant degree on a promise or agreement of the

prosecutor," that promise "must be fulfilled"). Mr. Svara asks this Court to hold the government to the position it has already taken in its own submission to the Probation Office: paragraphs 33 through 38 establish the falsity of Mr. Svara's statements and support the obstruction enhancement already reflected in the guideline calculation above. They should not also be read, at sentencing, as a freestanding aggravating circumstance untethered from the count to which the parties agree they are legally tied. Mr. Svara has not been charged with, and has not pleaded guilty to, any offense arising from that material, and the guideline range already accounts for the one count in which it plays a legal role.

For these reasons, Mr. Svara's total offense level is properly calculated at 11, his advisory guideline range at 32 to 38 months, and the sentence requested below, no more than 36 months, falls within that properly calculated range.

## SENTENCING MEMORANDUM

Three independent measures converge on the same conclusion here: Mr. Svara's particular mitigation, the properly calculated guideline range, and the Sentencing Commission's data on how courts actually sentence comparable defendants. Each, standing alone, supports a sentence of no more than 36 months. Together, they confirm that such a sentence is sufficient — and anything greater is more than necessary — to serve every purpose § 3553(a) identifies.

**Analysis of the § 3553(a) Sentencing Factors**

**A.    The Nature and Circumstances of the Offense Warrant a Sentence of No More Than 36 Months.**

Section 3553(a)(1) requires this Court to consider "the nature and circumstances of the offense." Nothing that follows is meant to minimize or reframe the pain Mr. Svara's victims have endured, and continue to endure, because of his conduct. Their voices have been heard. Mr. Svara accepts the harm described in their statements, and he has read every victim impact letter submitted in this case with due shame and contrition. He does not ask this Court to disregard what they have said. He asks only that four additional facts, each drawn from the Report itself, inform how this Court weighs what happened.

First, while co-conspirator Steve Waithe directly contacted and extorted many of the victims whose account information Mr. Svara supplied, Mr. Svara did not. He never threatened a victim. He never demanded further images to prevent disclosure of the ones he already had. He never engaged any victim in the kind of ongoing, personal exploitation that defined Waithe's own conduct and that typically attends this type of offense conduct. Mr. Svara's phishing messages posed as automated Snapchat support; once a victim responded, his direct involvement with them ended. This distinction matters again below, in the unwarranted-disparity analysis comparing Mr. Svara to Waithe as well as to other defendants.

Second, money did not drive this scheme. Waithe paid Mr. Svara three times, for a total of $50, over the entire course of their arrangement. (PSR ¶ 19). Had Mr. Svara built this scheme for profit, that would aggravate his conduct considerably. He

11

did not, and counsel acknowledge that the absence of a financial motive does not lessen the privacy Mr. Svara invaded. But it does inform why he did it, a question this Court must also answer under § 3553(a)(1).

Third, the charged phishing and hacking scheme underlying Counts One through Four stopped in early 2021, before any investigator ever contacted Mr. Svara. He does not dispute paragraph 29 of the Report, which describes different, later conduct: his continued and deeply troubling consumption of similar material online for several years afterward. That conduct belongs to this Court's history-and-characteristics analysis below, and it is not offered here as a virtue. But the scheme that produced Counts One through Four, the scheme that targeted the victims discussed above, ended in 2021 as charged.

Finally, Mr. Svara's remorse is not a talking point offered for this Court's benefit. It runs through nearly every letter submitted in this case. *See*, *e.g.*, (Frank Svara, p. 6) ("Kyle has spoken with me about his mistakes. He has taken responsibility for his actions and expressed genuine remorse for the harm they caused. These conversations have not been easy, but they have been sincere."); (Mark Cole, p. 29) ("Kyle has expressed sincere remorse for his actions and understands the impact they have had on his family, the victims, and the broader community."); (Gina Svara, p. 3) ("Since the offense, I have seen further change in Kyle. He speaks openly about his remorse and his desire to be better."); (Erin Wilczewski, p. 18) ("He understands the harm that has been caused and the breach of trust involved. He conveys a sincere desire to make amends and rebuild his life with integrity."); (Megan

12

Batinick, p. 9) ("Kyle has spoken honestly with me and has taken accountability for his actions. I have witnessed his deep regret and remorse for his actions.").

None of this excuses Mr. Svara's conduct or minimizes what his victims have suffered. It is offered because the victims themselves, in their own words, remain the truest narrators of the harm this offense caused.

**B.    Mr. Svara's History and Characteristics Justify a Sentence of No More Than 36 Months.**

Section 3553(a)(1) also requires this Court to consider "the history and characteristics of the defendant." Mr. Svara's depression, isolation, and long-untreated mental health struggles, together with the concrete steps he has since taken toward rehabilitation, justify a sentence within the range properly calculated by Probation.

### 1.    *Bullying, Depression, Isolation, and a Need for Acceptance*

Every generation has known a version of the same child: the one called "the brain," whose grades and acceptance letters suggest that he is thriving, while his own hallways and bathrooms tell a different story his family cannot see. That child does not need a broken home or an empty refrigerator to be wounded. He needs only a world that has taught him his worth is conditional on performance, and classmates ready to remind him, time and again, exactly where he stands. Mr. Svara was that child.

To outside observers, Mr. Svara had a normal, happy childhood. He grew up in Plainfield, Illinois, an hour southwest of Chicago. (PSR ¶ 69). Both parents worked, his father as a software engineer and his mother as a nurse, and his material needs

were met. (PSR ¶¶ 71–73). He excelled in school, driven in part by expectations he felt obligated to satisfy. (PSR ¶¶ 70–71). That picture of happiness was largely a façade. Beneath it, Mr. Svara struggled with mental health problems rooted in bullying that began as early as first grade.

Mr. Svara suffers from Crohn's disease, a chronic inflammatory bowel condition that causes severe abdominal pain, diarrhea, and uncontrolled bathroom use. As a young child, Mr. Svara was assigned a classroom bathroom pass to accommodate his medical needs. His classmates noticed and began following him into the bathroom to mock him. He was ultimately permitted to use the school nurse's bathroom instead — his mother's office — to escape the abuse. Kyle became known as the "Poop Pass Kid" and worse. He tried several medications, each with its own side effects; his mother recalls that some made him "angry, irritable, and sometimes very sad," and that there were days "he begged not to go to school because he felt so unlike himself on the medication, even though we knew it was necessary to reduce inflammation." (Gina Svara, p. 3). He missed school for medical appointments and, in his mother's words, "developed fear and anxiety about going to school because of his symptoms." (Gina Svara, p. 3).

Classmates also mocked Mr. Svara's appearance, calling him "Dumbo" and other names because of his unusually large ears. (PSR ¶ 71); see also (Megan Batinick, p. 9) ("He was often teased by other kids due to his stomach issues and for having large ears, neither of which was helpful for a young child's self-esteem."). His mother recognizes the toll it took: "From an early age, around five years old, he began

14

experiencing health issues that I did not realize at the time would affect his mental health and emotional well-being as deeply as they have." (Gina Svara, p. 3).

His parents saw the bullying. But they did not see its depth, in part because their son's academic success masked it. Not wanting to disappoint them, and unable at that age to name what he was feeling, Mr. Svara kept it to himself. Emily writes: "Looking back, the signs of deep depression were there. He was suffering silently." (Emily Svara, p. 1). Rather than confide in his family, he "internalized and normalized" the ridicule (PSR ¶ 71) and learned instead to look elsewhere for acceptance and validation.

### 2. *High School Struggles and an Early Introduction to Trading Explicit Images*

Crohn's disease continued to affect Mr. Svara through high school, and not only physically. His mother recalls a "deeper change" during this period, when he became "more withdrawn and irritable at times, especially during flare-ups and when taking steroids." (Gina Svara, p. 3). She told herself it would pass and did not seek professional help, a decision she now says she "will always regret." (Gina Svara, pp. 3–4). His parents do not deserve blame for that. Mr. Svara hid his struggles well enough to graduate valedictorian of Plainfield North High School in 2017, mentor younger students, tutor special-education classmates, and win admission to a selective engineering program at the University of Illinois.

It was also in high school, through a group of friends, that Mr. Svara first encountered the trading of explicit images among teenagers, a documented feature of adolescent behavior. See Victor C. Strasburger et al., *Teenagers, Sexting, and the*

15

*Law*, 143 Pediatrics 1 (2019).[4] That history excuses nothing that came later. It marks only the point at which a practice that would later consume his life first entered it.

### 3. College, the COVID Lockdown, and the Start of the Offense Conduct

Mr. Svara enrolled at the University of Illinois in 2017 to study computer engineering. Away from the structure of home, he struggled academically, and his depression deepened. (PSR ¶ 91). By his sophomore year, his grades slipped, his contact with family had thinned, and he spent more and more time online.

Then the pandemic hit. When Mr. Svara came home for spring break in March 2020, he did not know he would never return to campus. His parents, trying to protect vulnerable grandparents, imposed a strict lockdown: no friends, and for a time, no contact even with his girlfriend, Emily. His isolation became total. Years of buried anguish, carried since childhood, finally broke through. He locked himself in his room for hours at a time, and his family watched him do it.

Those closest to Mr. Svara describe this period consistently. His father recalls him "struggling with uncertainty, isolation, anger, and stress in ways I had not seen before." (Frank Svara, p. 6). His father-in-law writes that "the isolation, uncertainty, and disruption to daily life during that period intensified feelings of depression that

---

[4] The prevalence of sexting and sharing personal images amongst teenagers is well-documented. Amy Adele Hasinoff, *Teenage Sexting is Not Child Porn*, N.Y. Times, Apr. 4, 2016 (available at, https://nyti.ms/3tXgjCv) (last visited July 10, 2026) ("Studies have shown that roughly one-third of 16- and 17-year-olds share suggestive images on their cell phones."); Alexandra Sifferlin, *Teen Sexting Has Become Even More Common, Research Says*, Time, Feb. 26, 2018 (available at, https://time.com/5172906/sexting-messages-teens/) (last visited July 10, 2026) (15% of surveyed teenagers reporting sending sexts and 27% receive them).

he was experiencing. Depression can impair judgment and emotional resilience, and I believe it played a meaningful role in his struggles at that time." (Michael Richards., p. 14); see also (Janice Renee Richards, p. 12) ("In hindsight, it is understandable how the sudden loss of independence, isolation, and uncertainty deeply affected Kyle."); (Lauren Polich, p. 33) ("I noticed how reserved and quiet Kyle was which led me to believe he could have been depressed or in a dark place during this time in our lives.").

The lockdown also kept Mr. Svara from Emily, compounding his isolation. (Janice Renee Richards, p. 12) ("During his junior year, COVID forced him to return home, and he was not given the option to return for his senior year . . . their time together was extremely limited."); (Gina Svara, p. 4) ("He became isolated, spending most of his time in his room. He was withdrawn and sometimes angry. It felt like I was walking on eggshells."). Even after restrictions eased and campuses reopened, Mr. Svara's parents kept him home, a decision his father now calls a mistake: "Looking back, I believe this decision did more harm than good. It is clear that this period took a significant toll on him, and that some of his decisions were made while he was not at his best." (Frank Svara, p. 6). Mr. Svara ultimately graduated walking across an empty stage, with only his parents present. (Gina Svara, p. 4). Emily describes watching it happen:

> When Kyle left for college, being away from his family was one of the hardest adjustments of his life. Still, he persevered, leaning on close friends and pouring himself into his studies. Then the pandemic came and the world around us shut down, and so did Kyle. Kyle's world abruptly collapsed inward. His campus closed, his friendships became distant, and the normal rhythms of life disappeared. Fear was everywhere — especially fear of bringing illness home to the people he loved most. To protect his high-risk family members, Kyle isolated

17

himself even further. During that time, I watched the light in him begin to dim. He withdrew into his bedroom for days at a time. He stopped engaging with the world. Even when restrictions lifted, he struggled to reconnect. He slept through much of the day, spoke very little, and carried a heaviness that was impossible to ignore.

(Emily Svara, p. 1).

The offense conduct underlying Counts One through Four occurred during this period of distress and isolation. Counsel do not suggest that COVID caused Mr. Svara's crimes; countless people endured the same pandemic, many with far less support than he had, without breaking the law. But Mr. Svara was already in a downward spiral before the lockdowns began, carrying years of untreated depression and negative self-worth stemming from the cruel formative experiences with his peers, and the lockdown accelerated that spiral. His sister watched it happen and could not, at the time, name what she was seeing: Kyle was, she recalls, "sad and angry for reasons unknown" and simply "not his normal self." (Megan Batinick, p. 9). That was Mr. Svara's entry point into the offense conduct.

### 4.    Mr. Svara's Tremendous Family Support

When Mr. Svara's conduct became public, he became, overnight, a pariah in his own community. Plainfield is not a large town, and word travels fast. Many of the identified victims came from Mr. Svara's own high school. The ostracism that followed was natural, expected, and in significant part deserved; it was also painful for a family, especially Emily, that had done nothing wrong. Despite all of it, and despite knowing that a real prison term awaits him, Mr. Svara's family has not left his side. His father commits to remaining "a constant presence in his life" and to supporting

18

"his rehabilitation and reintegration into his family and community." (Frank Svara, p. 7). His mother commits to supporting "Kyle, Emily, and [their son] emotionally and financially through this difficult time." (Gina Svara, p. 5).

Emily's commitment carries particular weight, because Mr. Svara's conduct breached her trust too. Her continued dedication, forged through counseling since his misconduct came to light, speaks for itself: "I stand by my husband completely. I will visit him at every opportunity, write every letter, answer every call, and support him in every way I can. . . . He has shown me through his actions — not just his words — that he is worth standing beside for the rest of our lives." (Emily Svara, p. 2).

That support extends well beyond his immediate family. (Mike Alaimo, p. 24) ("I will remain close with Kyle during his incarceration. I will visit, write, and take his calls to help support him through rehabilitation."); (Janice Renee Richards, p. 12) ("I have supported Kyle since these events came to light and will continue to do so both emotionally and financially. . . . we will do whatever it takes to help them rebuild their lives during and after this difficult time."). This network matters because it signals what awaits Mr. Svara on release. His father put it simply: "He will not be returning to a vacuum, he will be returning to a family that loves him, believes in him, and expects him to live responsibly and lawfully." (Frank Svara, p. 7). Others make the same promise. (Aidan Wilczewski, p. 20) ("Friends that have become family deserve no judgement, but require a support system and I am on his team."); (Bill Ferguson, p. 21) ("I will provide him with the guidance and accountability necessary

19

as he rejoins our community."); (Erin Wilczewski, p. 18) ("I am committed to being there for Kyle and his family unconditionally.").

Mr. Svara accepts that imprisonment is coming, and he is focused on what follows it: rejoining a one-year-old son whose earliest years he will miss. His father already sees the father Mr. Svara has become, "patient, gentle, and deeply invested in being present and responsible," a man for whom "fatherhood has grounded him and given him a renewed sense of purpose." (Frank Svara, p. 6). His mother agrees, describing him as a "loving and attentive husband and father." (Gina Svara, p. 5). People who knew Mr. Svara during the offense conduct and know him now describe two different men. (Mark Cole, p. 29) ("I have watched him grow into a devoted father, offering guidance, affection, and stability to his young son.").

Some may be tempted to fault Mr. Svara for starting a family knowing prison might follow. That criticism does not hold up. Building a family has been part of Mr. Svara's rehabilitation, not a substitute for it, and his wife says so directly: "Kyle is not defined by his worst moments. He is defined by the way he has taken responsibility, sought help, and devoted himself to becoming a better husband, father, son, and member of his community…It has been honest, painful, and transformative." (Emily Svara, p. 2). His commitment to his family belongs in his rehabilitative arc, not apart from it.

### 5. *Mr. Svara's Commitment to Therapy and His Low Risk of Recidivism*

As noted at the beginning, Mr. Svara is grateful for law enforcement's intervention in July 2024. Even though the phishing scheme had stopped, Mr. Svara

was still engaged in other online conduct he now regrets. (PSR ¶¶ 27–29). The FBI's involvement forced him to confront that conduct and its roots, a process that began in September 2024 and continues today.

Mr. Svara's therapist at Unbroken Family Counseling, Nick Giannasi, has treated him since that month. Mr. Giannasi reports that Mr. Svara presented with Acute Stress Disorder, Generalized Anxiety Disorder, and Persistent Depressive Disorder. (Giannasi Letter, p. 1). Mr. Svara has since "demonstrated significant stabilization since entering treatment. He is accountable, insight-oriented, and actively engaged in the therapeutic process. He has expressed profound remorse and shame for his actions. His current functioning does not reflect the level of impairment described during 2020." (Giannasi Letter, p. 3). Mr. Giannasi's bottom line: "Based on his sustained engagement in treatment and observed behavioral changes, his risk of recurrence appears significantly reduced." (Giannasi Letter, p. 3).

An independent evaluation confirms that judgment. Dr. Karen L. Smith, a Licensed Sex Offender Evaluator, interviewed Mr. Svara, administered a battery of psychological and sexual-risk assessments, and diagnosed Major Depressive Disorder and Generalized Anxiety Disorder. Her conclusion on recidivism is direct: "It is my professional opinion to a degree of scientific certainty that Mr. Svara has low recidivism risk regarding a sexual offense. He has two treatment needs on the Stable 2007 and many protective factors that will be supportive of treatment." (Dr. Smith Report, p. 11). *See also* PSR ¶ 88.

Both professionals agree that continued treatment is what keeps that risk low, and Mr. Svara has already committed to that treatment for nearly two years. His father explains why it has taken hold: "He has also taken meaningful steps toward personal growth, including working consistently with a therapist. I have seen him reflect, grow, and commit himself to becoming a better husband, father, and person. He understands what is at stake, and he understands that real change requires effort, humility, and consistency." (Frank Svara, pp. 6–7).

### 6.    *Mr. Svara's Youth at the Time of the Offense*

Every stage of this case traces back to Mr. Svara's youth. He first encountered the trading of explicit images as a teenager in high school, through a group of friends. (See Section B.2, supra). The phishing and hacking conduct underlying Counts One through Four itself arose years later, but while Mr. Svara was still a college student, isolated by the COVID-19 lockdown described above, and it ended in early 2021, when he was still in his early twenties. (See Section B.3, supra).

The Sentencing Commission has recently recognized that this stage of life carries real weight at sentencing. Effective November 1, 2024, the Commission amended USSG § 5H1.1 to add that a downward departure may be warranted due to "the defendant's youthfulness at the time of the offense," recognizing that "[c]ertain risk factors may affect a youthful individual's development into the mid-20's," including environment, "adverse childhood experiences," and "lack of educational opportunities," and that youthful individuals remain "more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young

22

adulthood." USSG § 5H1.1. The amendment also credits "the age-crime curve" — the finding that criminal behavior "tends to decrease with age" — and concludes that youthful individuals "are more amenable to rehabilitation." *Id*.

While § 5H1.1 and other departures have been deleted in the 2025 guidelines pursuant to Amendment 836 that streamlined the three-step sentencing process by no longer requiring sentencing courts to consider departures, in announcing these changes the Sentencing Commission clarified that "[t]he removal of departures does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer be considered for purposes of determining the appropriate sentence." (Sentencing Commission Letter, Sept. 3, 2025, available at: https://tinyurl.com/2zbntd9w) (last visited July 11, 2026). Section 5H1.1 is now located in Appendix B (May 1, 2025), which can be found at: https://tinyurl.com/2cyyracn (last visited July 11, 2026). Thus, the deletion of USSG § 5H1.1 as part of the Sentencing Commission's overhaul of the guidelines in no way diminishes the import of Mr. Svara's youthfulness as a sentencing consideration.[5]

---

[5] Indeed, the relevant portion of Appendix B reiterates that point:

> [T]he removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a).

2025 Federal Sentencing Guidelines, Appendix B, Part III, Compilation of Deleted Departure Provisions.

Mr. Svara is not a hypothetical case study of putative rehabilitation; he is an embodiment of it. He was introduced to this conduct as a teenager, still finding his footing among his peers. He committed the charged offense a few years later while young, isolated, and away from the structure of his family for the first time. And he has already shown the rehabilitative capacity the Commission associates with youth: nearly two years of sustained treatment and two independent professional evaluations rating him a low risk to reoffend. (See Section B.5, supra). The age-crime curve the Commission relies on is not an abstraction in this case. It is what this record already shows.

## C. A Sentence of No More Than 36 Months Satisfies the Need for Just Punishment and Adequate Deterrence.

Having weighed the nature and circumstances of the offense and Mr. Svara's history and characteristics, the Court must fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public, while giving Mr. Svara access to whatever correctional treatment he needs. 18 U.S.C. § 3553(a)(2)(A)–(D).

Just punishment and deterrence point toward the same number here. The floor is the mandatory 24 months already required by Count One. The only real question is what, if anything, beyond that floor justice requires. "Just" has real content: "having a basis in or conforming to fact or reason," "being what is merited." Merriam-Webster.com, *just* (last visited July 9, 2026). A sentence greater than necessary cannot be just under the structure Congress wrote into § 3553(a); the parsimony clause forbids it. Mr. Svara asks for no more than twelve additional months beyond

24

the mandatory term, a total of no more than 36. That number sits within the properly calculated advisory range of 32 to 38 months, and it reflects what this record unambiguously demonstrates: a defendant in sustained treatment, evaluated by two professionals as a low risk to reoffend, supported by a family and close community prepared to help him succeed.

As for general deterrence, whatever message this case sends will already be sent by Mr. Svara's arrest, prosecution, conviction, and the two years of mandatory imprisonment Congress has fixed for the identity theft alone. It strains reason to believe that a person weighing whether to commit similar crimes would be deterred by a 45-month sentence but not by one of 36. Even 24 months, standing alone, sends a serious deterrent message.

The Sentencing Commission's own data confirm that a sentence of no more than 36 months is not unduly lenient; it is what courts across the country impose on defendants who look like Mr. Svara on paper. For fiscal years 2021 through 2025, the Commission identified 26 defendants nationwide who shared Mr. Svara's primary guideline, § 2B1.1, his final offense level of 11, and his criminal history category of I, and who were also convicted of a § 1028A aggravated identity theft count. (PSR ¶ 119). Every one of them received a sentence of imprisonment. The average sentence imposed was 33 months; the median was 32. (PSR ¶ 119). Mr. Svara's request sits at the upper end of what similarly situated defendants have actually received, not below it. This is not a request for leniency. It is a request that this Court sentence Mr. Svara

the way courts across the country sentence people whose guideline profile matches his.

Mr. Svara's low risk of recidivism is not only the conclusion reached by Mr. Giannasi and Dr. Smith. It also follows from the statistical reality that first-time offenders reoffend at markedly lower rates than defendants with a criminal history. See *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (Gertner, J.) (imposing a below-guideline sentence based in part on the defendant's status as a first offender, citing Sentencing Commission data showing that defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming a below-guideline sentence for a first-time offender because prison would mean more to him "than to a defendant who previously had been imprisoned"); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (below-guideline sentence appropriate where the defendant had never been confined before, and the sentence was sufficient "to impress upon him the seriousness of the offense and to deter others under similar circumstances"); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

26

**D.      A Sentence of No More Than 36 Months Avoids Unwarranted Sentencing Disparities.**

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The most relevant comparator is Mr. Svara's own co-conspirator, Steve Waithe. See *United States v. Waithe*, No. 21-CR-10342-PBS (D. Mass. Mar. 6, 2024).

Waithe, a former Northeastern track coach, recruited several people, including Mr. Svara, to obtain images from hacked social media accounts. Unlike Mr. Svara, Waithe contacted his victims directly and extorted them for more images. Mr. Svara supplied Waithe with images from certain accounts that Waithe, in turn, used against those victims, and Waithe paid Mr. Svara a total of $50 across three transactions. Waithe separately obtained images by posing as a fitness consultant, conduct in which Mr. Svara played no part. Judge Saris sentenced Waithe to 60 months, roughly 33 months above his own request and 24 months below the government's. The First Circuit affirmed. *United States v. Waithe*, 150 F.4th 16 (1st Cir. 2025).

Two factors that justified Waithe's sentence are absent here. First, Waithe kept offending after his arrest, logging into his Instagram account at least 135 times while on pretrial release to solicit more images from victims. *Id.* at 20. The First Circuit agreed that this "release misconduct . . . heightened recidivism concerns and thus created the need for additional specific deterrence and public protection." *Id.* at 27. Mr. Svara has done the opposite. He has engaged in sustained treatment and pro-social activity throughout his release, with no violations.

Second, the First Circuit found that Waithe abused his position of power. As his athletes' coach, Waithe "used that power to steal their intimate images for his own gratification and, later, used those stolen photographs as leverage to obtain additional compromising images." *Id.* at 25. The court treated that coach-athlete relationship as an aggravating factor distinguishing Waithe's case from "anonymous computer-hacking scenarios." *Id.* Mr. Svara occupied no comparable position over any victim. Even as to the victims he knew personally, he never leveraged a relationship of authority the way a coach leverages his position over an athlete, and he never communicated with any victim beyond the phishing message that gained him access to an account. That conduct is serious. It is not what Waithe did, and it does not carry the aggravating weight the First Circuit assigned to Waithe's abuse of his coaching position. A sentence anywhere near Waithe's 60 months — as the government urges — would create exactly the disparity § 3553(a)(6) was designed to prevent.

Other cases confirm that a sentence of no more than 36 months falls squarely within the range imposed for comparable conduct nationwide:

- *United States v. Majerczyk*, No. 1:16-cr-00550 (N.D. Ill.). A sophisticated phishing scheme using fake email addresses to obtain victims' usernames and passwords, then their nude photographs and videos; more than 300 victims, including celebrities. Charged with unauthorized access to computer. Sentence: 9 months.

- *United States v. Adams*, No. 23-cr-00204 (E.D. Pa.). Hacked Snapchat accounts of at least 20 female victims by posing as Snapchat staff, then shared victims' private images with their friends, family, and coworkers, and posted some publicly. Charged with wire fraud. Sentence: 22 months.

- *United States v. Moore & Evens*, No. 2:13-cr-00917 (C.D. Cal.). Moore operated a website distributing nude images accounts that Evens hacked.

28

Hundreds of victims. Charged with computer intrusion and aggravated identity theft. Sentences: 30 months (Moore) and 25 months (Evens).

• *United States v. Faber*, No. 8:21-cr-00021 (N.D.N.Y.). Hacked and directed others to hack college students' online and school-email accounts to steal nude images and traded the images with others. Charged with computer intrusion and aggravated identity theft. Sentence: 36 months.

• *United States v. Potts*, No. 6:19-cr-06034 (W.D.N.Y.). Obtained credentials for over 100 accounts to steal personal information and nude photographs; possessed over 1,000 stolen images across roughly 65 identified victims. Charged with unauthorized access to computer. Sentence: three years' probation (the defendant also received a state-court sentence of one year imprisonment for related conduct).

• *United States v. Abrahams*, No. 8:13-cr-00199 (C.D. Cal.). Used hacking software to control 100 to 150 computers, secretly recorded victims through their own webcams, and extorted some victims using their nude images to obtain more images, and also posted nude images of women when they did not comply with his demands. Charged with unauthorized access to computer and extortion. Sentence: 18 months.

• *United States v. Reyes Ruiz*, No. 5:19-cr-00159 (N.D. Cal.). An engineer who used his employer access to hack thousands of accounts and steal financial data and nude images, amassing roughly two terabytes of stolen data including between 1,000 and 4,000 private images and videos. Charged with computer intrusion and interception of wire or electronic communications. Sentence: five years' probation.

• *United States v. Boyer*, No. 23-cr-00232 (M.D. Pa.). Hacked Snapchat accounts of dozens of women over two years and sold the images, earning $50,000 to $60,000. Charged with unauthorized access to computers. Sentence: 18 months.

• *United States v. Wilson*, No. 22-cr-00048 (W.D. Ky.). A police officer who used law-enforcement databases to identify targets for hackers, then personally extorted victims for additional explicit images. Charged with conspiracy to commit stalking. Sentence: 30 months.

Mr. Svara's requested sentence sits comfortably within the range these cases establish, particularly given the substantial mitigation unique to this case.

29

## CONCLUSION

Seneca's observation was not a Stoic platitude. Mr. Svara has lived under that proverbial whip for two years, and it will not lift when this sentence is imposed. What remains for this Court is not to add to that private reckoning, but to determine what justice, measured by the record and by the sentences this Court's own data show, requires.

Mr. Svara does not ask this Court for a sentence that erases what he did. He asks for one that speaks to the man he is today: a first-time offender who has spent nearly two years treating the depression and trauma that drove his crime and his despair, who is assessed by two independent professionals as a low risk to reoffend, and who will return, when his sentence ends, to a wife, a young son, and a family and community that continue to stand by him. For the reasons set forth above, counsel respectfully request a sentence of no more than 36 months, within the properly calculated advisory guideline range and consistent with the sentences this Court's own data show similarly situated defendants have received. That sentence is sufficient, and no more than necessary, to satisfy the purposes of 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/ Todd S. Pugh
**TODD S. PUGH**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

/s/ William H. Connolly
**WILLIAM H. CONNOLLY**

30

## CERTIFICATE OF SERVICE

I, Todd S. Pugh, hereby certify that on July 14, 2026, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, and the district court's General Order on Electronic Case Filing.

/s/ Todd S. Pugh

**TODD S. PUGH**
BREEN & PUGH
53 W. Jackson Blvd., Suite 1550
Chicago, Illinois 60604
(312) 360-1001 (t)
(312) 362-9907 (f)
tpugh@breenpughlaw.com

31