UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 25-cr-10472-BEM |
| | ) | |
| KYLE SVARA, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this sentencing memorandum in connection with the sentencing of defendant Kyle Svara, which is scheduled to take place on July 21, 2026. Based on the applicable Guidelines sentencing range and the factors under 18 U.S.C. § 3553(a), the government recommends a sentence that includes 36 months of incarceration for Counts Two through Five, to be followed by the mandatory 24 months of incarceration on Count One; a fine of $7,500; three years of supervised release; a mandatory special assessment of $500; restitution in the amount of $738.05; and forfeiture.[1]

## OFFENSE CONDUCT

The offense conduct is summarized below and set forth in greater detail in the Presentence Investigation Report ("PSR"). PSR ¶¶ 6-38.

---

[1]    Pursuant to the Court's Procedural Order Re: Sentencing, Dkt. No. 31, the government respectfully reports that (1) the government is not moving for any departure from the applicable guideline range but is seeking an upward variance based the Section 3553(a) factors; (2) there are no legal questions that have not been adequately addressed in the presentence report ("PSR") and the parties' objections to the PSR; and (3) that there are no factual issues which the government contends would require an evidentiary hearing.

From at least May 2020 to February 2021, Svara executed a phishing and hacking scheme of breathtaking magnitude. Using anonymized, internet-based phone numbers with Los Angeles, California area codes, Svara posed as the "Snapchat Support Team," and sent more than 4,500 outgoing messages to at least 1,571 unique phone numbers. PSR ¶¶ 10-12, Addendum ("Add.") at 44. As of the government's last count, investigators had associated approximately 759 of those phone numbers with victims.[2] Of these victims, at least 557 responded to Svara's phishing text messages with codes that would permit Svara to access the victims' Snapchat accounts. Investigators have confirmed that Svara then successfully accessed the Snapchat accounts of at least 517 of these victims. PSR Add. at 45. Below are three examples of Svara's phishing texts:



Notably, two of these messages depict Svara's attempts to obtain an additional, four-digit access codes, which he could use to access the extra-private "My Eyes Only" section of a victims' Snapchat account. *See* PSR ¶ 13.

Once Svara accessed a victim's Snapchat account, he did two things:  First, he took steps to conceal who he was, such as by using a VPN, and to lock the victim out of their account, such

---

[2]    The government previously reported to Probation that this number was 738. *See* PSR Add. at 44. This number increased since the PSR was finalized, based on investigators' processing of additional recent victim interviews, and the now-accurate number is 759.

as by enabling two-factor authentication. PSR ¶ 14. Then, Svara downloaded any nude or semi-nude images and videos that victims had stored in their accounts. *Id.* at ¶ 15.

But Svara did far more than just keep this stolen, private content for himself. Svara saw an opportunity to make money from his hacking, and to obtain more content, and he took it. Svara disseminated the stolen victim content across the internet in sales and trades, and provided his advertised his phishing and hacking services to others, as he advertised in approximately 41 separate online posts, an example of which is included below:



PSR ¶ 9. To track his efforts, Svara maintained spreadsheets and "notes" application lists on his computer and phone that contained victims' names, contact information, and Snapchat and Instagram usernames. PSR ¶ 24. These trackers also documented Svara's degree of hacking success with notes to himself like "priority," "got in, couldn't crack meo [My Eyes Only]," "got a few," "wrong snap," and "TONS OF HOT NUDES, TRY AGAIN," and contained personal information about victims that appears to have been provided by individuals purchasing Snapchat hacks from Svara to help Svara guess probable passwords, such as "Likes Harry Potter, likes San Francisco, likes Buenos Aires, bday March 4." *Id.*

One customer of Svara's was Steve Waithe. Waithe was a former track and field coach at Northeastern University who perpetrated various schemes to obtain nude or semi-nude photos of women on the team that he coached and others. PSR ¶ 18. In one such scheme, Waithe solicited at least five co-conspirators, including Svara, to gain access to his victims' social media accounts

through phishing and hacking.[3] Svara sent over 120 phishing messages to approximately 53 of Waithe's known targets, and received access codes in response from at least 27 victims. PSR ¶ 19, Add. at 45. Svara then sold the content he stole to Waithe for $50. PSR ¶ 19.

On July 30, 2024, investigators executed federal search warrants and seized Svara's electronic devices. PSR ¶ 22. What they found on these devices evidenced a few key facts:  First, Svara's 2020 and 2021 conduct was consistent with Svara's longstanding interest in leaked or stolen nude content, which dated back to 2016 and continued through 2024. PSR ¶¶ 23, 26. Second, Svara's conduct was calculated, as evidenced by his 2019 purchase of a special application to find victims on Snapchat and his creation of an anonymous Instagram account to surveil his victims, among other things. *Id.* Third, on numerous occasions, Svara took steps to delete or otherwise hide his stolen content and efforts to obtain it, such as by wiping his devices. *Id.* at ¶¶ 22, 27. And fourth, Svara's collection of stolen, nude content did not end when he appeared to stop hacking in 2021, or in 2022 when he moved in with his wife, or at any time after that. Indeed, through the July 30, 2024 search warrant execution, Svara continued to access and download "leaked" nude content, tried to recover content he had deleted, surreptitiously recorded women wearing bikinis or tight pants, and maintained a collection of 6,100 nude "leaked" images and videos on his MacBook and more than 250 images and videos of at least 11 identified victims of his Snapchat hacking scheme on his iPhone, in addition to approximately 400 images and videos of other Snapchat-related content. *Id.* at ¶ 29.

Svara then appeared to cooperate with investigators in two voluntary interviews, but was not then and still has never been actually honest about his conduct. Svara first agreed to speak to

---

[3]    Another co-conspirator was Paul McDowell, whose recent sentencing is discussed below in the section of the government's memorandum addressing sentencing disparities.

investigators on July 30, 2024 and stated, among other false and shifting statements over the course of the interview, that he had never been paid for Snapchat hacking and did not know how to hack a Snapchat account. PSR ¶ 31. As to child pornography, he stated, "for children, no, God no, ok, I wouldn't do that," and "I don't think I've done anything where it's like underage where I looked at underage, I would never do that." *Id.* Svara agreed to speak with investigators again on February 7, 2025, and again was dishonest. For example, Svara falsely stated that he had no interest in child pornography and no desire to view images of people under the age of 18. PSR ¶ 32.

Only when investigators later accessed Svara's Mega and Instagram accounts did they find out just how untrue Svara's statements had been. In Svara's Mega account, for example, investigators found approximately 530 images and 600 videos depicting child pornography. PSR ¶ 34. Several of the videos had the ages three and four in their names and depicted female children of these approximate ages engaging in oral and vaginal sex acts with adult men. Additionally, investigators located evidence that Svara had distributed child pornography, including approximately 95 share links, one of which Svara described as "crazy" that contained 901 files, including two videos with the descriptive titles "2010 4yo hermanitas_y_yo ()" and "niña paraguaya de 11 anal y creampie." *Id.* These videos both were approximately four minutes long and respectively depicted a female child approximately four years old being orally and vaginally penetrated by an adult penis and a female child approximately 10 to 12 years old being vaginally penetrated by an adult penis until the penis ejaculated in the child's anus. *Id.*

In Svara's Instagram account, investigators found additional evidence of Svara's interest in and collection of child pornography. PSR ¶¶ 37-38. For example, investigators found a February 2019 exchange where Svara asked an Instagram user to provide a video of that user having sex with a thirteen-year-old female child, and other similar videos when the child was 14 and 15. PSR

¶ 37. Svara asked the user twice to "send younger" and commented "ya that's good stuff." *Id.* Investigators also located at least six conversations that Svara had with users who expressly identified themselves as underage in which Svara lied about his age, solicited photographs of the users, and/or sent them photographs of his penis. *Id.* at ¶ 38. At one point a user asked expressly, "[d]oes it bother you that I'm underage?" and stated "I'm not 18." Svara replied, "Oh okay. More live pics? (:" *Id.* at 38.

## SENTENCING GUIDELINES CALCULATION

In the parties' plea agreement, Dkt. No. 10 at § 10, the government calculated Svara's total offense level to be 14, and the breakdown of its calculation was as follows:

| | |
|---|---|
| Base offense level, § 2B1.1(a)(1) | **7** |
| Offense involved 10 or more victims, § 2B1.1(b)(2)(A)(i) | **+2** |
| Offense involved receiving stolen property and Svara was in the business of receiving and selling stolen property, § 2B1.1(b)(4) | **+2** |
| Offense involved sophisticated means, § 2B1.1(b)(10)(C) | **+2** |
| Defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information, § 2B1.1(b)(18) | **+2** |
| Defendant abused a position of public / private trust or used a special skill in a manner that significantly facilitated the commission / concealment of the offense, § 3B1.3 | **+2** |
| Defendant willfully obstructed the administration of justice with respect to the investigation / prosecution /sentencing of the instant offense, and the conduct related to the offense / any relevant conduct; or a closely related offense § 3C1.1 | **+2** |
| Acceptance of responsibility, § 3E1.1 | **-3** |
| Zero-point offender adjustment, § 4C1.1 | **-2** |
| **Total Offense Level** | **14** |

Probation and the government largely agree on this Guidelines calculation, with the exception of Probation's omission of two enhancements: the enhancement for receiving stolen property and being in the business of receiving and selling stolen property, and the enhancement for using a

special skill in a manner that significantly facilitated the commission or concealment of the offense. The government addresses both enhancements in the sections that follow.

I.       **Different Aspects of Defendant's Offenses Involved Sophisticated Means and the Use of a Special Skill, Such that Both Enhancements Apply**

The final PSR incorrectly removed a two-level enhancement under USSG § 3B1.3 for Svara's use of a special skill to significantly facilitate the commission or concealment of his offenses. "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." USSG § 3B1.3 cmt.4. However, "a defendant need not necessarily have formal education or training in order to be found to possess a special skill," because "[a] special skill may also be acquired through experience or self-tutelage." *United States v. Prochner*, 417 F.3d 54, 61 (1st Cir. 2005) (citing, *e.g., United States v. Noah,* 130 F.3d 490, 500 (1st Cir. 1997)). The First Circuit has noted that "the rationale behind the enhancement" is to address "the special danger posed by one whose training magnifies or facilitates the potential for harm." *United States v. O'Brien*, 435 F.3d 36, 42 (1st Cir. 2006) (citing *United States v. Connell*, 960 F.2d 191, 198-99 (1st Cir. 1992)).

Svara objected to the enhancement on two bases. First, he argued that neither his computer engineering degree nor his job in Bank of America's technology branch support the application of the enhancement. Second, Svara argued that applying the enhancement constitutes impermissible double counting of the same conduct that supports the application of the "sophisticated means" enhancement under USSG § 2B1.1(b)(10)(c).

But both arguments miss the mark because both enhancements should apply on the basis of distinct facts. Svara's social engineering scheme involved sophisticated means. For example, Svara utilized multiple fictitious online identities to advertise his services, follow his victims' social media accounts, and obtain victim emails, phone numbers, and/or Snapchat usernames. *See*

PSR ¶¶ 8-9, 23. Svara maintained detailed spreadsheets and lists on his electronic devices to keep track of the information he had obtained through this victim surveillance, including personal information about victims that reflected Svara's attempts to guess passwords. PSR ¶ 24. Svara posed as a member of the "Snapchat Support Team," and sent text messages that he drafted to sound like messages that someone in that role might send. Notably, the substance of these messages changed over time as Svara apparently experimented with phrasing to improve his success rate. This complex social engineering scheme alone supports the application of the enhancement for utilizing sophisticated means under USSG §2B1.1.(b)(10)(c).

Indeed, Probation and the Court applied the sophisticated means enhancement to Svara's co-conspirator Steve Waithe where he engaged in no technologically sophisticated conduct but tricked women into providing him with intimate photographs through a series of social engineering schemes.[4] For example, Waithe used the anonymous Instagram account "privacyprotector" to pose as someone who could help victims scrub revealing images from the internet using a "reverse image search" for images that he convinced victims to send him. *United States v. Waithe*, 150 F.4th 16, 19 (1st Cir. 2025). Waithe also created two fictious online female personas that he used to convince victims to participate in "a phony 'body development study' for athletes," which likewise purportedly required them to "send him nude or semi-nude photographs so that the 'study' could track their 'progress.'" *Id.* There is no meaningful distinction between these schemes and Svara's. Posing convincingly as a person to whom a victim can be convinced to provide personal information is no easy feat and requires a degree of sophistication that warranted the sophisticated means enhancement in Waithe's case and also supports its application here.

---

[4]    The government no longer has access to the Waithe PSR and accordingly does not know precisely why Probation applied the enhancement to Waithe. The government is inferring the basis for the enhancement from the facts on the record in the Waithe case.

Separately and additionally from this social engineering, Svara engaged in conduct utilizing a special skill that supports the application of the additional enhancement under USSG § 3B1.3. Specifically, Svara's use of encrypted messaging applications, VOIP text messaging applications, and two-party authentication applications in the course of his hacking, and his knowledge of how to wipe his electronic devices and hide content on offshore online storage platforms like Mega demonstrate that Svara used a special skill to facilitate and conceal his conduct. Svara had and used knowledge that "eclipses that possessed by the general public," *Noah*, 130 F.3d at 500, and the special skill enhancement should apply as a result.

*United States v. Prochner* is instructive in this regard. In *Prochner*, the First Circuit considered the application of the "special skill" enhancement where a defendant "used self-taught computer skills" to 'hack'" websites' order logs and unlawfully obtain credit card numbers. 417 F.3d at 61. The First Circuit held that even in the absence of record evidence that the defendant had education or training in computers, the sentencing court could "reasonably infer requisite self-education from the nature and extent of the skill possessed." *Id.* The defendant argued that even "a novice Internet surfer" could access the channels he used to check the validity of credit card numbers and said that he could easily access these channels with any computer, at any time of day. The First Circuit rejected this argument too. The court noted that "nothing in the guidelines suggests that the specialness of the faculty necessarily hinges on the complexity of the task to be performed." *Id.* (quoting *Noah*, 130 F.3d at 500). Instead, "[t]he critical question is 'whether the defendant's skill set elevates him to a level of knowledge and proficiency that eclipses that possessed by the general public.'" *Id.* (quoting *Noah*, 130 F.3d at 500). And in that case, the court held that it was not clearly erroneous for the sentencing court to apply the enhancement where the defendant's hacking of websites "exceed[ed] the knowledge of the average Internet user." *Id.* The

Court stated that regardless of any lack of specialized training, "[w]here the record supports a finding of a skill of sufficient kind and scope at a level well beyond that of a member of the general public, [the Court will] affirm the reasonable judgment of the district court." *Id.* at 62.

In the instant case, the record supports the finding of a skill of sufficient kind and scope at a level well beyond that of a member of the general public. While it may be true that applications like Snapchat and VPNs are widely used, it is not the case that most members of the public possess sufficient knowledge of and familiarity with these and the other internet-based applications Svara used to use them in the manner that Svara did. For example, Svara knew how to obtain multiple VOIP phone numbers that would make it appear that he was texting from the same geographical area as Snapchat's headquarters. *See* PSR ¶¶ 10-12 & n.2. He knew how to use two-factor authentication applications to lock victims out of their own Snapchat accounts once he had unlawfully accessed them. *See* PSR ¶ 14. And he knew how to broker the sale of stolen material on encrypted messaging applications like Telegram and Kik, *see* PSR ¶¶ 9, 25, and how to store stolen material on encrypted, offshore storage platforms like Mega, *see* PSR ¶¶ 23, 29. Even assuming *arguendo* as Svara claims that a member of the general public knows how to use these applications, Svara was far from their average user. Moreover, in addition to using encrypted messaging and storage applications, Svara knew how to erase his electronic devices to further cover his tracks. *See* PSR ¶¶ 26-27. Taken together, these facts demonstrated that Svara drew on his training and experience with computer engineering and internet security, likely as well as some self-tutelage, to construct a layered structure of anonymized and encrypted applications in order

to hide on the internet both who he was and what he was doing.[5] The "special skill" enhancement applies here to address the "special danger" that this defendant posed. *O'Brien*, 435 F.3d at 42.

As to "double counting," courts have rejected arguments like Svara's where, as here, there is a distinct factual basis for each of these two enhancements. *See, e.g.*, *United States v. Farrace*, 805 F. App'x 470, 475 (9th Cir. 2020) ("The sophisticated means enhancement accounted for [Svara's], a shell company, to obscure the fact that he was selling his homes to himself. . . . On the other hand, the abuse of trust or special skills enhancement was imposed based on [Svara's] utilization of his skills as a real estate lawyer and former broker to conduct the fraud."); *United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998) ("The special skill adjustment focuses on [defendant]'s use of his legal training. The sophisticated means enhancement arises because of the use of multiple accounts and corporate names. Thus, both enhancements could be invoked."). Here, both enhancements should apply on the basis of separate conduct, and Svara's total offense level should be increased by one level as a result.[6]

---

[5] The PSR reflects that in his interview with Probation, Svara stated that his job involved "providing production support and investigating internal payment processing issues involving vendors and customers." PSR ¶ 93. In his interview with investigators on July 30, 2024, Svara further explained that in his job, "when there's issues with someone trying to Zelle, you know, they make a complaint to the call center and then we triage internally and try to understand where the issue stemmed from. We have different vendors that have streams with our applications, so we have to contact the vendors and get them on the bridge line and discuss what the issue is." Svara explained that his computer science degree was required so that "when somebody calls and, and like some issue is described, you're like, 'Oh, I know, fix that.'" This description indicates that Svara's job required him to have and use knowledge of internet-based applications and security measures like those he used in the instant offense.

[6] As the PSR reflects, if the "special skill enhancement" is not applied, the "sophisticated means enhancements results in a three-level increase. PSR ¶ 50. If both enhancements apply, the "special skill" enhancement adds two level and the "sophisticated means" enhancement also adds two levels, for a total increase of four levels.

**II.     Defendant's Offense Involved the Receipt of Stolen Property and Svara Was in the Business of Receiving and Selling Stolen Property**

The government objected to the PSR on the basis that an additional two-level enhancement should be included because Svara was "in the business of" receiving and selling stolen items. USSG § 2B1.1(b)(4). The government outlined its reasoning in its objection, which is included in the PSR, and incorporates that argument herein by reference. PSR Add. at 37-38. However, the government acknowledges the enhancement's applicability is a close call based on the specific facts of this case and accepts Probation's treatment of its objection.

**SENTENCING RECOMMENDATION**

The government respectfully requests a sentence that includes 36 months of incarceration for Counts Two through Five, to be followed by the mandatory 24 months of incarceration on Count One; a fine of $7,500; three years of supervised release; a mandatory special assessment of $500; restitution in the amount of $738.05; and forfeiture. The government submits that this sentence represents a reasonable and just outcome that is sufficient but not greater than necessary to reflect the seriousness of Svara's offenses, promote respect for the law, provide just punishment, and deter both Svara from re-offending and others from engaging in similar conduct.

**I.     Nature and Circumstances of the Offense**

First, the nature and circumstances of the offense warrant a meaningful term of imprisonment. As of the latest count—which has continued to rise as victims have continued to come forward—Svara targeted likely over 1500 but definitely at least 759 people, and he successfully compromised the private Snapchat accounts of at least 517. This conduct had a devastating impact. Fourteen of Svara's victims have shared their experiences with the Court in Victim Impact Statements, which are attached as Exhibit A, and their words reflect several core themes: The many victims who knew Svara personally note how much more difficult it is to be

12

violated and betrayed by someone you know. Victims describe the severe mental health consequences that they have suffered as a result of the defendant's invasion of their privacy—crippling anxiety, pain, shame, and pervasive paranoia. Victims find themselves unable to trust others as they previously had, and describe grappling with feelings of fear, vulnerability, and being unsafe. And victims describe these harms as real, lasting, and constant. Clearly, Svara took more than just these victims' most intimate and personal possessions, though he certainly took those too. He took their confidence, autonomy, and ability to trust, and such losses are not easily repaired.

Unfortunately, the gravity and magnitude of the defendant's conduct are in no way captured by the Sentencing Guidelines that are applicable to the defendant's offenses. As the Court knows, § 2B1.1 typically is used for white collar crimes and accordingly measures loss in dollars. Indeed, § 2B1.1 treats crimes impacting 10 victims as severely as it treats crimes impacting 500. *See* § 2B1.1(b)(2)(A)(i). Section 2B1.1, and the rest of the Guidelines, simply are not designed to capture the defendant's conduct—the theft, via fraud, of intimate images of women that are tremendously valuable, if not in dollars, and the irreversible dissemination of that material on the internet. Accordingly, neither the guidelines as calculated by the government nor as calculated by Probation will result in a sentence sufficient to achieve the Section 3553(a) goals of sentencing. The government submits that an above-guidelines sentence is necessary in such circumstances.

## II.     **Need for General and Specific Deterrence**

The government's recommended sentence not only reflects the serious nature of the offense but also promotes respect for the law and provides both just punishment and adequate deterrence.

First, a five-year sentence is necessary to deter Svara from reoffending upon his release from custody. This case did not result from a single lapse in judgement or fleeting mistake but rather represents the culmination of Svara's years-long pattern of conduct in service of an insatiable obsession. Svara took purposeful steps over a period of nearly one year to target over

1,500 people and successfully compromise over 500 victims' Snapchat accounts. He hid his criminal conduct from those close to him—which is an alarming feat in itself given his conduct's volume and frequency—and he engaged in a cycle of deletion and recovery to avoid detection. PSR ¶ 29. Moreover, there is reason to fear that even a criminal conviction will not deter Svara from similar going forward. For one thing, materials like Svara's own psycho-sexual evaluation reflect concerning results of a sexual addiction screening test and the need for specialized treatment related to sexual boundaries, legal consent, and child pornography. PSR ¶ 88. For another, Svara *still* has never been honest about the full extent of his conduct. He was not honest with his family and friends, he was not honest with investigators in July 2024, he was not honest with investigators in February 2025, and the information provided by his therapist and psycho-sexual evaluator suggests that he still is not being honest with his treaters. *See* PSR ¶ 86 (describing defendant's admission that he exchanged nude images and underage pornography with peers in high school); PSR ¶ 88 (describing Svara's ongoing efforts to rationalize and justify his behavior). Given the persistence of these issues in the face of this criminal case, there is no reason to expect a sudden about-face upon Svara's release from custody. Svara's demonstrated ability and willingness to hide major parts of himself from others and his persistent *in*ability to take full responsibility for his conduct demonstrate that a significant sentence is necessary for specific deterrence.

Second, a significant sentence is necessary to deter others who may be tempted to live the same online double life and steal private conduct from unsuspecting victims. As the Court well knows, it is incredibly challenging for investigators to identify and investigate online predators like Svara whose technological skill is ever evolving and increasing. There is a robust and thriving online economy for the stolen content that Svara trafficked in, and participants in these marketplaces often think they can act with impunity. Where online criminal actors believe not only

14

that they will not be caught but also that they will not face severe punishment even if they are, there is little to deter them from continuing to target and harm vulnerable victims over the internet. The Court needs to signal that criminal conduct is not less serious because it happens online, particularly where, as here, that conduct causes tremendous suffering to victims. The Court further needs its sentence to underscore the steep cost of repeatedly lying to investigators.    The government submits that its suggested sentence will send these important and necessary messages.

### III.    History and Characteristics of Svara

Svara's history and characteristics also support the government's sentencing recommendation. Svara is not the typical defendant who appears before this Court. He was raised in a stable household by two loving parents and as part of a close-knit family. PSR ¶¶ 70, 75. Svara grew up without any exposure to abuse of any kind, graduated from college, maintained steady employment, and bought the home where he currently lives with his wife and child. PSR ¶¶ 69, 71, 76, 79, 91-98. Svara's history reflects no challenges with poverty, addiction, or a lack of opportunity, which would not excuse his criminal conduct but could provide context for it. The government appreciates that Svara has a longstanding inflammatory bowel disease and has struggled with anxiety and depression, the latter of which worsened during the COVID pandemic. PSR ¶¶ 81, 83-86. But Svara's concerted efforts over the period of nearly a year to steal intimate images from hundreds, and hundreds, and hundreds of people cannot be explained away by "impaired judgment" or even the most "profound isolation." PSR ¶ 86. Many people suffered during the COVID pandemic, and very few made the decision to dedicate their newfound free time to a campaign of online predation.  Svara should be sentenced accordingly.

### IV.    Need to Avoid Unwarranted Sentencing Disparities

The government's recommended sentence will avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct. The most direct comparators to

Svara are his co-conspirator, Steve Waithe, and Paul McDowell, another Snapchat hacker who, like Svara, was hired by Waithe to phish and hack victim Snapchat accounts. For their crimes, Waithe was sentenced to five years in prison in this District and McDowell was sentenced to six in the Northern District of Indiana,[7] which sentences align with the government's five-year recommendation in the instant case.

The sentencing of Paul McDowell is most instructive because of how similarly situated McDowell and Svara are. McDowell was college educated, a first-time offender, and isolated during the COVID pandemic. Exhibit B, Court Sentencing Memo., at 5-7. McDowell also had a chronic depressive illness and a documented "decade of mental health treatment." *Id.* at 5-7. On top of that, he "shouldered from birth spina bifida, paralysis below the knees, and all that comes with his physical and mental health conditions," *id.* at 5-7; *see also id.* at 12. And he was charged with unauthorized access of a computer in violation of 18 U.S.C. § 1030(a)(2)(C) and (c)(2)(B)(i), and aggravated identity theft in violation of 18 U.S.C. 1028A(a)(1), for successfully phishing and hacking the Snapchat accounts of 22 victims, and attempting to hack another 15. *Id.* at 8.

But the Court's understanding of McDowell's complex medical situation and struggles during COVID did not excuse his behavior, just as the same factors should not excuse Svara's in the instant case. The Court fully took into account McDowell's "outstanding" character, "his true gifts when used for good, his more remarkable acceptance of responsibility, his sincere desire for and pursuit of rehabilitation and treatment, his medical and mental health conditions, [and his willingness to comply with the court's expectations of him." *Id.* at 13. And the Court weighed this

---

[7]     The Court imposed an additional 70 months for McDowell's possession of child pornography, to run concurrent with sentence for McDowell's computer intrusion offense. Ex. B at 14. This portion of McDowell's sentence is not relevant to the instant case because Svara is not charged with possession of child pornography offense, so the government does not rely upon portions of McDowell's sentencing or sentence that relate to child pornography.

against the nature of McDowell's crimes and in particular the suffering of his victims, some of whom had bravely "describe[d] the psychological and physical effects of their abuse" for the Court. *Id.* at 9. It was this harm that made necessary a serious penalty above and beyond the 24-month mandatory minimum. As the Court explained, "[t]he mandatory minimum for aggravated identity theft addresses a certain harm—the use of a person's identity during another felony—but hacking in the manner that [McDowell] did introduced a duality of harms. He not just violated the privacy and dignity of 22 girls or women, but shared this material with others, amplified the harm by risking its permanence, and facilitated stalking of these victims." *Id.* at 9. The Court rejected McDowell's argument, based on three medical evaluations, that McDowell's conduct was driven by his poor impulse control, opining that "[s]omeone who can grind through the years and tasks of college, work, and therapy can eventually get it without calling the whole of his conduct mere impulse-driven." *Id.* at 10. And the Court concluded that a sentence of 48 months for McDowell's computer intrusion offense, to be followed by 24 months for his aggravated idenify theft, was sufficient but not greater than necessary to satisfy the goals of sentencing. *Id.* at 14.

Waithe, who hired both McDowell and Svara and whose schemes depended in large part upon their talents, was sentenced to five years in prison, which was well above the upper limit of his guidelines sentencing range of 27-33 months. Exhibit C, Sentencing Transcript, at 7, 69, 71. Judge Patti B. Saris stated that she was "absolutely stunned by the number of victims that existed in [Waithe's] case," which included 51 successful account compromises and seventy-two attempts. *Id.* at 69-70. She noted that the victims had lost far more than "some money," because they had "lost their privacy and their sense of safety." *Id.* at 70. She also recognized that Waithe had committed his crimes despite being "blessed with great athletic ability," attending "one of the finest universities in our country," and growing up in a "good home" with parents who were "moral

17

and trustworthy people." *Id.* at 70-71. Judge Saris declined to impose the 84-month sentence requested by the government because she felt "that the Guidelines are an important anchor, and it was just too high a jump," but she was comfortable with a sentence of five years' imprisonment, which she estimated increased his total offense level by "about six levels." *Id.* at 70-71.

Svara's conduct here is worse than either McDowell's or Waithe's. It is worse by volume: Where McDowell had 22 victims (and 17 attempts) and Waithe had 56 (and 72 attempts), Svara had at least 517 (and up to 759 including attempts). And it is worse in kind: Where McDowell targeted strangers and Waithe targeted women he knew, Svara targeted both random strangers and *also* his neighbors, family friends, grade school classmates, high school classmates, personal friends, family friends, and friends of his wife and sister. PSR ¶ 21. A sentence that includes a total term of five years in prison is eminently reasonable when considered beside Waithe's five-year sentence and McDowell's six-year sentence for similar conduct.

## V.    **Restitution**

The government has received two restitution requests from victims, which are attached as Exhibits D and E. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Victim 19 requests restitution for two security cameras she purchased for $67 to "help ease a small portion of [her] stress, anxiety, and constant paranoia" and provider her an "ounce of safety." *Id.* at 3. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Restitution is warranted under the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, which permits a sentencing court to "order restitution in any criminal case to the extent

agreed to by the parties in a plea agreement." *Id.* § 3663(a)(3). Here, the parties agreed to restitution in their plea agreement, in an amount to be determined at or within 90 days of sentencing. Dkt. No. 10 § 4(e). The government respectfully requests that the Court grant the two restitution requests described above and award restitution to Victim 19 ███████████ in the amount of $67 and to Victim 94 ███████████ in the amount of $671.05, for a total restitution amount of $738.05. The government conferred with defense counsel and understands that Svara does not object to an order of restitution in this amount.

## VI.    Fine

The government requests that the Court impose a fine of $7,500, which is at the low end of the guidelines range as calculated by the government in the plea agreement, *see* §5E1.2(c)(3); Dkt. No. 10 at § 4(b), and near the low end of the range as calculated by Probation. PSR ¶ 114. A modest fine is appropriate here because Svara has the means to pay, PSR ¶ 100, there is limited restitution, and a fine will help to fund the Crime Victims Fund, which finances crime victim assistance and compensation programs throughout the United States.[8]

## VII.    Additional Condition of Release

Svara has informed the government that the government took possession of the only copy of Svara's wedding photographs when the government seized Svara's electronic devices. Svara has requested that the government return the photographs, which the government is willing to do. However, because the wedding photographs include images of multiple victims who were in Svara's wedding party, the government is unwilling to provide the photographs to Svara directly. Svara has proposed that the wedding photographs be provided to his wife, who will maintain them

---

[8]    *See e.g.*, https://www.congress.gov/crs-product/R42672#_Toc167283484 (describing funding for the Crime Victims Fund, which is not appropriated and instead comes from sources including criminal fines, which historically are the largest source of deposits into the Fund).

in a manner such that Svara will not have unsupervised access to them. The government requests that this be made a condition of Svara's pretrial and supervised release.

### CONCLUSION

The government recognizes that its recommended sentence including a total of five years of imprisonment is significant, and does not take lightly its responsibility to recommend an appropriate sentence in this case. The government believes that its sentencing recommendation is appropriate, properly reflects the seriousness of Svara's offenses, promotes respect for the law, provides just punishment, and serves to deter Svara from re-offending and others from engaging in similar conduct. For the foregoing reasons, the government respectfully requests that the Court impose the government's requested sentence of 36 months of incarceration for Counts Two through Five, to be followed by the mandatory 24 months of incarceration on Count One; a fine of $7,500; three years of supervised release; a mandatory special assessment of $500; restitution in the amount of $738.05; and forfeiture. The government believes this sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense and the history and characteristics of Svara, promote respect for the law, provide just punishment, and afford adequate deterrence.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date: July 14, 2026          By:  /s/ *Meghan C. Cleary*
                             MEGHAN C. CLEARY
                             Assistant U.S. Attorney

20

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 14, 2026.

<u>/s/ Meghan C. Cleary</u>
Meghan C. Cleary
Assistant U.S. Attorney